## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| T.M. and S.M., Individually and as Parents and Natural Guardians of J.M., a minor; AND J.M., minor child of T.M. and S.M., | : | No. 3:24cv1465 |
| | : | |
| | : | (Judge Munley) |
| **Plaintiffs** | : | |
| v. | : | |
| | : | |
| EAST STROUDSBURG AREA SCHOOL DISTRICT; COLONIAL INTERMEDIATE UNIT 20; WILLIAM RIKER, Superintendent, East Stroudsburg Area School District; JENNIFER MORIARTY, Principal, Colonial Intermediate Unit 20; DAMARIS ROBINS, Transportation Director, East Stroudsburg Area School District; AND RUDOLPH PARCIASEPE, | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

Plaintiff J.M., a six-year-old boy with special educational needs, allegedly sustained permanent injuries after being violently beaten by another student on the school bus while restrained in his seat.  J.M. and his parents, T.M. and S.M., brought this action against Defendants East Stroudsburg Area School District ("ESASD"), Colonial Intermediate Unit 20 ("CIU20"), Superintendent William Riker, Principal Jennifer Moriarty, Damaris Robins, and Rudolph Parciasepe. Before the court is defendants' motion to dismiss plaintiffs' amended complaint.

The parties have briefed their respective positions and the matter is ripe for a decision.

**Background**

This action arises out of events aboard an ESASD school bus on two separate occasions.[1]  At all times relevant to this action, J.M.'s parents enrolled him in a CIU20 classroom at Middle Smithfield Elementary School in the school district. (Doc. 10, Am. Compl. ¶ 27).   At an early age, providers diagnosed J.M. with autism spectrum disorder and severe intellectual disabilities. (Id. ¶ 25).  J.M. is unable to communicate verbally. (Id. ¶ 26).

ESASD, through its contract with Defendant CIU20, provided specialized education to J.M. (Id. ¶ 28).  J.M.'s educational needs classroom consisted exclusively of students with special needs. (Id. ¶ 33).  Based upon his disabilities, J.M. also rode an ESASD bus comprised exclusively of students with special needs, including children with documented behavioral issues. (Id. ¶ 34).  Surveillance cameras allegedly recorded each trip. (Id. ¶ 40).  According to plaintiffs, ESASD maintains copies of all footage recorded from the bus cameras.

---

[1] These brief background facts are derived from plaintiffs' amended complaint and the exhibits attached thereto.  At this stage of the proceedings, the court must accept all factual allegations in the amended complaint as true.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  The court makes no determination, however, as to the ultimate veracity of these assertions.

(Id.)  Two incidents on the ESASD bus occurring on March 8 and April 25, 2022, are central to this action. (Id. ¶¶ 41-47, 74-83).

On or about March 8, 2022, staff allegedly placed J.M. on the bus with older able-bodied children known to ESASD to have documented behavioral issues.[2] (Id. ¶ 42).  Plaintiffs allege that staff strapped and restrained J.M. in his seat presumably due to his disabilities, thereby making him the only child on the bus who was restrained during the ride. (Id. ¶ 44).  That day, a substitute bus driver named Michele, an ESASD employee, operated the bus.[3] (Id. ¶¶ 43 46). When J.M.'s father, T.M., picked up J.M. at the bus stop, Michele told T.M. that his son was very noisy and irritated on the ride home. (Id. ¶ 46).  T.M. then discovered significant scratch marks on J.M.'s neck, behind his left ear, and on one of his fingers. (Id. ¶ 47).  Because J.M. is non-verbal, he could not explain to his parents how the scratch marks appeared on his body. (Id. ¶ 50).  Plaintiffs maintain that J.M. had no such marks when he left for school that morning. (Id. ¶ 48).

According to the amended complaint, no one from ESASD or CIU20 contacted J.M.'s parents about the scratch marks on the minor child's body from the March 8 incident. (Id. ¶ 51).  Still, J.M.'s mother, S.M., emailed Ms. Lopez,

---

[2] It remains unclear from the amended complaint whether those staff members were employed by ESASD or CIU20.

[3] The substitute bus driver's last name has not been provided in the amended complaint.

J.M.'s teacher at CIU20, to inquire about the marks. (Id. ¶ 52).  Ms. Lopez responded that nothing had occurred in class that could have caused those marks. (Id. ¶ 54).  Additionally, Ms. Lopez noted that her classroom staff did not notice any scratches on J.M. when they were preparing him to leave for the day. (Id.)  Ms. Lopez allegedly concluded that the scratch marks were sustained on the bus and advised S.M. to speak with the bus driver. (Id. ¶¶ 54-56).  S.M. then forwarded Ms. Lopez's email to Defendant Damaris Robins, ESASD's transportation director, attaching pictures of J.M.'s scratch marks. (Id. ¶ 58).

In her email to Defendant Robins, S.M. requested that J.M. be seated in the front of the bus so the driver could monitor him and ensure his safety. (Id.) Receiving no response, plaintiffs allege that S.M. followed up by asking to review the bus's surveillance footage from the afternoon of March 8, 2022. (Id. ¶ 59). Defendant Robins allegedly replied that she would examine the footage herself. (Id. ¶ 60).  Five days later, Robins finally responded to S.M., indicating that she reviewed the video footage from that day, found nothing unusual, and that J.M.'s scratch marks did not occur on the bus. (Id. ¶ 61).  Plaintiffs allege that Robins's statements conflicted with what the substitute school bus driver, Michele, told J.M.'s father about his son being noisy and irritated on the bus. (Id. ¶ 62).  S.M. emailed Robins to point out the discrepancy, but Robins never responded. (Id. ¶ 63).

4

In their amended complaint, plaintiffs allege that a student, identified as Student A., attacked J.M. on March 8 and that this child was known to the school district as having behavioral issues and violent tendencies. (Id. ¶ 64). Plaintiffs also contend that an ESASD employee reported the March 8 incident to the ESASD administration. (Id. ¶ 66). Nevertheless, according to plaintiffs, ESASD employees failed to intervene or take any steps to address this incident. (Id.) Subsequently, S.M. sent multiple emails to Defendant Robins, again requesting that J.M. be seated near the front of the bus. (Id. ¶ 69). Nonetheless, S.M.'s emails allegedly went ignored. (Id. ¶¶ 70, 73).

On April 25, 2022, J.M. again rode the bus with Student A. on board. (Id. ¶ 76). This time however, Defendant Rudolph Parciasepe, a driver employed by ESASD operated the bus. (Id. ¶¶ 36, 76). According to plaintiffs, Student A. violently attacked J.M. that day, repeatedly punching him in the face, nose, and eyes. (Id. ¶ 79). Plaintiffs allege that the attack lasted several minutes, causing J.M. to bleed heavily. (Id. ¶ 80). According to plaintiffs, the attack took place in plain view of Defendant Parciasepe who had a clear line of sight of the children in his rear-view mirror. (Id. ¶¶ 79, 83). Parciasepe allegedly failed to intervene and protect J.M. (Id.) Another student on the bus, Student T., allegedly reported the beating to Parciasepe, yet Parciasepe still did not act. (Id. ¶¶ 84, 85). T.M. met

the bus at J.M.'s stop that day. [4] (Id. at ECF p. 24).   When the bus arrived at

J.M.'s stop, T.M. discovered J.M.'s physical injuries, observing his son bleeding

profusely from his face. (Id.)  Plaintiffs allege that Defendant Parciasepe

downplayed the incident and led J.M.'s father to believe that it was merely a

nosebleed. (Id.)

J.M.'s parents reported the incident to ESASD. (Id.)  As a result, ESASD

allegedly suspended Defendant Parciasepe with pay for failing to intervene. (Id.)

Parciasepe later called T.M., J.M.'s father, to apologize for failing to inform him of

the attack. (Id. ¶ 91).  Defendant Robins, the transportation director, also

apologized to J.M.'s parents for her own failure and ESASD's failure to protect

J.M. (Id. at ECF pp. 24-25).  Furthermore, Robins allegedly explained that her

failure to comply with S.M.'s prior request to share the bus surveillance footage

from March 8, 2022 was due to student privacy concerns. (Id. ¶ 88).

Nevertheless, ESASD subsequently allowed T.M. to view a limited portion of the

April 25 video, which allegedly depicted the attack. (Id. ¶ 100).  Plaintiffs assert

that J.M. suffered traumatic and permanent injuries as a result of the March and

April 2022 incidents. (Id. ¶ 102).

---

[4] The court cites the page number of this portion of the amended complaint due to multiple
paragraphs being repeated.

On August 28, 2024, plaintiffs filed this action against ESASD, CIU20, Parciasepe, and Robins. (Doc. 1).  Plaintiffs also named ESASD superintendent William Riker and CIU20 principal Jennifer Moriarty as defendants. (Id.)  On January 2, 2025, plaintiffs filed an amended complaint. (Doc. 10, Am. Compl.). The amended complaint asserts multiple claims against the defendants based on the above allegations.  Those claims are as follows:

- Count I – Violation of the Fourteenth Amendment of the United States Constitution (asserted against all defendants),[5] (id. ¶¶ 115–121);

- Count II – Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504") (asserted against all defendants), (id. ¶¶ 122–129);

- Count III – Intentional Infliction of Emotional Distress ("IIED") (asserted against Defendants ESASD, Robins, and Parciasepe), (id. ¶¶ 130–156);

- Count IV – Negligence (asserted against Defendants ESASD, CIU20, Robins, and Parciasepe), (id. ¶¶ 157–180);

Defendants responded to plaintiffs' amended complaint by filing a motion to dismiss. (Doc. 15).

**Jurisdiction**

As the case is brought pursuant to 42 U.S.C. § 1983 ("Section 1983") and the Rehabilitation Act, the court has federal question jurisdiction. See 28 U.S.C. §

---

[5] Count I is construed as arising under 42 U.S.C. § 1983, which serves as a statutory tool for enforcing the Fourteenth Amendment.

1331.  The court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

**Legal Standard**

The court tests the sufficiency of the complaint's allegations when considering a Rule 12(b)(6) motion.  To survive a motion to dismiss, "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " Doe, 30 F.4th at 341–42 (quoting FED. R. CIV. P. 8(a)(2)).  This means that a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief which is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility when factual content is pled which allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. (citing Twombly, 550 U.S. at 570).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

The court evaluates motions to dismiss using a three-step process.  The first step involves identifying the elements of each claim. Oldham v. Pennsylvania State Univ., 138 F.4th 731, 743 (3d Cir. 2025) (citation omitted).  The second step involves reviewing the operative pleading and disregarding any formulaic recitation of the elements of a claim or other legal conclusion, as well as

8

allegations that are so threadbare or speculative that they fail to cross the line between the conclusory and factual. See Lutz v. Portfolio Recovery Assocs., LLC, 49 F.4th 323, 328 (3d Cir. 2022) (citations and quotation marks omitted). And third, the court evaluates the plausibility of the remaining allegations. Id. In evaluating plausibility of the plaintiffs' allegations, the court accepts all factual allegations as true, construes the complaint in the light most favorable to the plaintiff, and draws all reasonable inferences in the plaintiffs' favor. Id. (citations omitted).

**Analysis**

### I.    Violation of the Fourteenth Amendment

Defendants move to dismiss Count I of the amended complaint which alleges violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  Defendants argue that plaintiffs' allegations fail to identify a constitutional violation in this case. (Doc. 16, Br. in Supp. at 7). Additionally, defendants contend that plaintiffs failed to identify any policy or custom pertaining to ESASD or CIU20 that constitutes a violation under Monell v. New York City Dept. of Social Servs., 436 U.S. 658 (1978). (Id.)

Section 1983 serves as the vehicle through which private citizens may seek redress for violations of federal constitutional rights committed by state officials. The statute is not a source of substantive rights; rather it serves as a mechanism

9

for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002). As such, Section 1983 serves as a statutory tool for enforcing the Fourteenth Amendment. Lynch v. Household Finance Corp., 405 U.S. 538, 545 (1972). To establish a claim under Section 1983, two criteria must be met. First, the conduct complained of must have been committed by a person acting under color of state law. Sameric Corp. of Del., Inc. v. City of Phila., 142 F.3d 582, 590 (3d Cir. 1998). Second, the conduct must deprive the plaintiff of rights secured under the Constitution or federal law. Id.

Count I is asserted against all defendants. The court will begin by addressing plaintiffs' equal protection claims against all defendants. Next, plaintiffs' claims under the Due Process Clause will be addressed, first as to Defendants Robins and Parciasepe, and then as to Defendants Riker, Moriarty, and CIU20. Lastly, the court will address plaintiffs' municipal liability claim against ESASD.

### a. Equal Protection Claims

The Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND XIV, §1. The Equal Protection Clause directs that "all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To succeed with a Section 1983 claim for a denial of equal

10

protection, a plaintiff must prove the existence of purposeful discrimination and demonstrate that he received different treatment from that received by other individuals similarly situated. <u>Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.</u>, 587 F.3d 176, 196 (3d Cir. 2009).  All defendants assert that plaintiffs' amended complaint fails to substantiate purposeful discrimination in violation of the Equal Protection Clause.  (Doc. 16, Br. in Supp. at 9).

Plaintiffs allege that defendants discriminated against J.M. on the basis of his disabilities, namely, that he is autistic, has intellectual disabilities and is non-verbal. (Doc. 10, Am. Compl. ¶¶ 125, 128).  Defendants, by contrast, dispute that characterization. (Doc. 16, Br. in Supp. at 12).  In moving to dismiss plaintiffs' amended complaint, defendants argue that, as alleged, there were no reported issues with J.M.'s transportation before the March 8 incident or between the alleged two incidents. (<u>Id.</u>)  Defendants assert that, neither the transportation director, Defendant Robins, nor any other ESASD or CIU20 representative could have taken action in response to an incident of which they had no knowledge. (<u>Id.</u>)  They further assert that they had no reason at any point to believe that J.M. faced any danger or risk of attack on the bus. (<u>Id.</u>)

In opposition to the motion to dismiss, plaintiffs clarified their theory of liability. (Doc. 20, Br. in Opp. at 10-11).  Plaintiffs do not contend that J.M. was

treated differently from members of a similarly situated class to state an equal protection violation. (Id.)  Rather, they seek to proceed under the deliberate indifference doctrine developed by the Second Circuit Court of Appeals in Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 140-41 (2d Cir. 1999). (Id.)

The Third Circuit Court of Appeals has not yet addressed whether the Equal Protection Clause protects students from a school's deliberate indifference to student-on-student harassment.  In the absence of controlling authority, several district courts in this circuit have followed the Second Circuit's reasoning in Gant. See Doe v. Red Lion Area Sch. Dist., 2025 WL 19819, at *5 (M.D. Pa. Jan. 2, 2025) (Conner, J.); F.G. by & through Swisher v. Jersey Shore Area Sch. Dist., 2023 WL 6543097, at *4 (M.D. Pa. Oct. 6, 2023) (Brann, C.J.); George v. Bd. of Educ. of the Twp. of Millburn, 34 F. Supp. 3d 442, 460-61 (D.N.J. 2014) (Martini, J.); Dickerson v. Wallkill Valley Reg'l High Sch. Bd. of Educ., 2020 WL 2847757, at *4 (D.N.J. June 1, 2010) (Hayden, J.).  Assuming a claim of this nature is recognized in this circuit, the court will evaluate plaintiffs' equal protection claims under the Second Circuit's framework.

To show deliberate indifference in this context, a plaintiff must allege that: (1) he was in fact harassed by other students based on a protected characteristic; (2) the defendant school officials knew about the harassment; and

(3) "the defendant's response to such harassment was so clearly unreasonable in light of the known circumstances as to give rise to a reasonable inference that the defendant [itself] intended for the harassment to occur." DiStiso v. Cook, 691 F.3d 226, 241 (2d Cir. 2012) (internal citations and quotation marks omitted) (citing Gant, 195 F.3d at 140-41)); See also Doe, 2025 WL 19819, at *5.

After careful review of plaintiffs' allegations, their amended complaint fails to allege facts satisfying the first element of a deliberate indifference claim. Plaintiffs do not allege that Student A. or any other student harassed J.M. on account of his non-verbal autism and intellectual disabilities.  Rather, plaintiffs contend that Student A. attacked J.M. because he was strapped in his bus seat. Those contentions do not address whether Student A. targeted J.M. because of his disabilities.  Plaintiffs' proof of student-on-student harassment based on a protected characteristic is crucial to the first element of the deliberate indifference test. See Doe, 2025 WL 19819, at *5 (holding that the first element of deliberate indifference was satisfied where a male minor physically and sexually assaulted a female student on two occasions while riding the school bus; the assaults amounted to gender-based discrimination because the perpetrator only targeted female students); see also DiStiso, 691 F.3d 226, 229 (case arising from persistent racial harassment of a five-year-old child by his classmates in the form of name-calling and physical misbehavior); Gant, 195 F.3d 134, 138 (concerning

a six-year-old child who was subjected to racial name-calling by other children and once by a parent of another child while the harassed child was riding the school bus); F.G., 2023 WL 6543097, at *5 (involving severe and ongoing student-on-student racial harassment for several years).

In an attempt to bolster their allegations in their amended complaint, plaintiffs added a one-sentence assertion to their brief in opposition that J.M. was harassed at school based on his disabilities. (Doc. 20, Br. in Opp. at 11).  The amended complaint, however, contains no such allegation and confines its factual averments to the two incidents that occurred on the school bus.[6]  The amended complaint contains no allegations that J.M. was harassed at school because he has certain disabilities.  The amended complaint also does not allege that Student A. specifically harassed J.M. because of those issues.  Moreover, plaintiffs' arguments in their brief that defendants discriminated against J.M. based on his disabilities or that defendants "deliberately preyed on [J.M.]'s disability" are unrelated to the student-on-student harassment requirement. (Doc. 20, Br. in Opp. at 11-12).  These arguments pertain more directly to J.M.'s accommodations on the bus.  Under regulations promulgated by the Department of Education, such accommodations on board the bus required parental

---

[6] This argument was raised for the first time in plaintiffs' brief in opposition.  A complaint may not be amended by the briefs in opposition to a motion to dismiss. Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988).

14

approval. <u>See</u> 34 C.F.R. §§ 300.300, 300.34(c)(16). Plaintiffs do not allege that school officials imposed transportation accommodations on J.M. without their consent as parents in violation of the law. Be that as it may, the amended complaint, as alleged, does not satisfy the first element of the Second Circuit's deliberate indifference test.

On the other hand, plaintiffs advance sufficient facts supporting the second and third elements of the deliberate indifference test as to Defendants Robins and Parciasepe. Regarding the second element, that is, whether the school officials knew about the harassment, plaintiffs allege that S.M. reported the March 8 incident to Defendant Robins. (Doc. 10, Am. Compl. ¶ 58). Plaintiffs further contend that Defendant Parciasepe was aware of the April incident as he allegedly witnessed Student A. beat J.M on the bus. (<u>Id.</u> ¶ 138).

As to the third element of deliberate indifference, that defendants' response was so clearly unreasonable in light of the known circumstances, a closer look at each incident is warranted. Starting with the April incident, the allegations that Defendant Parciasepe failed to protect J.M. while observing Student A. attack the minor child are sufficiently pleaded to satisfy the third element here at this early stage. Turning to the March incident, Robins, the director of transportation for the school district, allegedly refused to provide S.M. with the surveillance footage from that day, ignored S.M.'s emails requesting that J.M.'s seat on the bus be

moved to ensure his safety, and disregarded S.M.'s request to initiate an investigation into the incident. (Id. ¶¶ 141, 142). At this stage of the proceedings, such allegations support the inference that Robins' behavior here was clearly unreasonable given that Student A. attacked J.M. again on April 25, 2022.[7]

Because the first element of deliberate indifference is not met, defendants' motion to dismiss plaintiffs' equal protection claims in Count I will be granted. The dismissal, however, will be without prejudice as amendment would not be futile. Plaintiffs will have the opportunity, if they so choose, to file a second amended complaint regarding their equal protection claims against the defendants.

### b. Substantive Due Process and State-Created Danger Claims

Moving to plaintiffs' due process claims, the Fourteenth Amendment also prohibits a state from "depriv[ing] any person of life, liberty, or property, without

---

[7] With respect to the school superintendent William Riker and school principal Jennifer Moriarty, the amended complaint does not include sufficient factual allegations to assess their conduct under the Equal Protection Clause. The amended complaint contains only generalized allegations that by virtue of their respective positions, Riker and Moriarty were responsible for overseeing Defendant Parciasepe. (Doc. 10, Am. Compl. ¶¶ 17-18). These allegations are insufficient to state equal protection claims against Riker or Moriarty. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior.") (citation omitted)). Plaintiffs' equal protection claims are thus subject to dismissal as to these defendants for failure to allege personal involvement.

As to Defendant CIU20, the amended complaint alleges that it unilaterally transferred J.M. from his previous school to a classroom at Middle Smithfield Elementary School. This issue is addressed below in the due process section. Apart from this allegation, plaintiffs identify no conduct by CIU20 related to the March and April incidents. Accordingly, the equal protection claims against CIU20 will be dismissed without prejudice.

due process of law.  U.S. CONST. AMEND XIV, §1.  "Individuals have a

constitutional liberty interest in personal bodily integrity that is protected by the

Due Process Clause of the Fourteenth Amendment." Phillips, 515 F.3d at 235

(citations omitted).  Generally, the state's failure to protect an individual against

private violence does not deprive that individual of their substantive due process

rights. DeShaney v. Winnebago Cnty. Dept of Soc. Servs., 489 U.S. 189, 197

(1989).  There are two exceptions to this general rule: the special relationship

exception and the state-created danger exception. Morrow v. Balaski, 719 F.3d

160, 167 (3d Cir. 2013), as amended (June 14, 2013).  Plaintiffs here rely solely

on the state-created danger exception. (Doc. 20, Br. in Opp. at 13).

The Third Circuit Court of Appeals adopted the state-created danger

doctrine when it "recognized that the Due Process Clause can impose an

affirmative duty to protect if the state's own actions create the very danger that

causes the plaintiff's injury." Morrow, 719 F.3d at 167 (citing Kneipp v. Tedder,

95 F.3d 1199, 1201 (3d Cir. 1996)).  Despite recent criticism of the doctrine, the

Third Circuit has not retracted this theory of Section 1983 liability.  Johnson v.

City of Philadelphia, 975 F.3d 394, 400 (3d Cir. 2020).

To plead a constitutional violation using the state-created danger doctrine,

a plaintiff must establish the following four elements: 1) foreseeable and fairly

direct harm; 2) action marked by a degree of culpability that shocks the

17

conscience; 3) a relationship with the state making the plaintiff a foreseeable victim, rather than a member of the public in general; and 4) an affirmative use of state authority in a way that created a danger, or made others more vulnerable than had the state not acted at all. Id. (citing Sauers v. Borough of Nesquehoning, 905 F.3d 711, 717 (3d Cir. 2018)).

The court will address plaintiffs' due process claims against certain defendants, beginning with Robins and Parciasepe (including the issue of qualified immunity), proceeding to Riker and Moriarty, and concluding with CIU20.

### 1. Defendants Robins and Parciasepe

For ease of disposition, the court will address the fourth element of the state-created danger doctrine first before turning to the remaining elements.

### i.    Affirmative Use of State Authority

With respect to the fourth element of the state-created danger doctrine, defendants argue that plaintiffs failed to allege any affirmative action by ESASD employees that made J.M. more vulnerable than he would have been had the defendants stood by and done nothing at all. (Doc. 16, Br. in Supp. at 16).  On the other hand, plaintiffs assert that Robins and Parciasepe affirmatively used their authority in a way that rendered J.M. more vulnerable to danger than had the state not acted. (Doc. 20, Br. in Opp. at 19).  Following a careful review of the

amended complaint, plaintiffs have sufficiently alleged this element as to Robins

and Parciasepe.

As a preliminary matter, the Third Circuit Court of Appeals has stated:

> The line between action and inaction is not always easily
> drawn. If the state puts a man in a position of danger from
> private persons and then fails to protect him, it will not be
> heard to say that its role was merely passive; it is as much
> an active tortfeasor as if it had thrown him into a snake pit.

Morrow, 719 F.3d at 177 (citing D.R. by L.R. v. Middle Bucks Area
Vocational Tech. Sch., 972 F.2d 1364, 1374 (3d Cir. 1992) (cleaned
up)).

In moving to dismiss plaintiffs' amended complaint, defendants rely on

Morrow to argue that the plaintiffs only allege failures to act, not affirmative acts.

719 F.3d at 178.  In Morrow, two sisters were repeatedly bullied in school

through threats, assaults, and acts of racial intimidation by a fellow female

student. Id. at 163.  One day, despite the school and state court interventions,

the other student boarded the sisters' school bus. Id.  That bus, however, did not

service the other student's home route. Id.  Eventually, the other student

threatened one of the sisters and elbowed her in the throat at a school football

game that evening. Id. at 164.  Among other things, plaintiffs in Morrow argued

that school officials affirmatively used their authority to create a danger by

allowing the other student to board the sisters' school bus. Id. at 177.  The Third

Circuit Court of Appeals affirmed the dismissal of the complaint and held that the

school officials' conduct, as alleged, amounted to inaction as opposed to

affirmative acts and thus did not meet the last element of the state-created danger doctrine. Id. at 178-79.

The circumstances of this case are distinguishable from those in Morrow. This case involves a vulnerable six-year-old child with non-verbal autism and intellectual disabilities. Despite J.M.'s disabilities and need for safety restraints, J.M. was placed on a bus with students known for their violent tendencies and behavioral issues, like Student A. (Doc. 10, Am. Compl. ¶ 179). Following the March 8 incident, where scratch marks allegedly appeared on J.M.'s body after riding the bus, Robins continued placing J.M. on that bus with Student A., while also rejecting S.M.'s requests to seat him in the front of the bus in view of the bus driver. (Id. ¶¶ 141, 145, 149, 156). Defendant Robins also allegedly knew that Student A. had documented behavioral issues and violent tendencies. (Id. ¶¶ 156, 173). Unlike Morrow, where the assailant was not regularly assigned to the plaintiffs' bus, Robins continued to place J.M. on the bus with Student A. and other students with behavioral issues and violent tendencies. On April 25, 2022, J.M. was placed across the aisle from Student A. (Id. ¶ 152). Then, Student A. attacked J.M.

In contrast, plaintiffs rely on Doe to argue that defendants affirmatively used their authority in a way that rendered J.M. more vulnerable to danger than had the state not acted at all. 2025 WL 19819, at *4. In Doe, a five-year-old

female student was twice physically and sexually assaulted by a male minor student while riding the school bus. Id. at *1.  Plaintiffs in Doe asserted, among other things, that the principal, the school psychologist, and the bus driver allegedly allowed the perpetrator to continue riding the bus with the five-year-old victim without supervision despite knowing of his prior assaults on the victim and another student. Id.  The Honorable Christopher C. Conner held that "placing Roe on the bus with her assailant made her less safe than providing no bussing system at all, and that is sufficient to state a due process claim." Id.  Because the state-created danger doctrine in Doe presented a fact-specific inquiry, the motion to dismiss was denied as to that issue.

The facts of this case bear close resemblance to those in Doe.  There, the same male student sexually assaulted a five-year-old girl twice on the school bus. Id. at *3.  Here, as gleaned from the allegations, Student A. attacked J.M. on the bus in March and April 2022.  Like the school principal in Doe, Robins, the school district's director of transportation, reviewed the video of a prior incident. (Doc. 10, Am. Compl. ¶¶ 60, 61).  In this case, Robins told S.M. that J.M.'s scratch marks did not occur on the bus. (Id. ¶ 61).  Plaintiffs allege that Robins's statements conflicted with those of the substitute school bus driver Michele and

Ms. Lopez's account.[8]  At this stage of the proceedings, the factual backdrop must be construed in a light most favorable to the plaintiffs.  Based on the allegations, it is plausible that Robins affirmatively misused her authority.

With respect to Defendant Parciasepe, plaintiffs allege that he was aware of Student A.'s behavioral issues and violent tendencies.  (Id. ¶ 83).  Student A. allegedly attacked J.M. in Parciasepe's plain view during the April incident.  (Id. ¶ 84).  Despite being alerted to the assault by Student T., Parciasepe continued to operate the bus.  (Id. ¶¶ 83, 84, 138).

As to Parciasepe's conduct, L.R. provides useful guidance.  L.R. v. Sch. Dist. of Philadelphia, 836 F.3d 235 (3d Cir. 2016).  In that case, the Third Circuit held that a kindergarten teacher affirmatively misused his authority by releasing a child to an adult stranger who failed to produce identification and authorization for release even after that stranger was asked to do so. Id. at 244. The adult stranger sexually assaulted the child the same day. Id. at 246.  While analyzing the fourth element of the state-created danger doctrine, the Third Circuit stated, "[r]ather than approach this inquiry as a choice between an act and an omission, we find it useful to first evaluate the setting or the 'status quo' of the environment

---

[8] Michele allegedly told J.M.'s father about his son being noisy and irritated on the bus. (Doc. 10, Am. Compl. ¶ 62).  Moreover, Robins's statements allegedly contradicted Ms. Lopez's account that the scratch marks observed on J.M.'s body from March 8 must have been inflicted on J.M. sometime between his departure from school and his drop-off at the bus stop. (Id. ¶¶ 54-56, 58).

before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo." Id. at 243.

Under the reasoning of L.R., a non-verbal autistic child with intellectual disabilities such as J.M. had his freedom of movement restricted on the bus. It appears from the amended complaint that Parciasepe was the only adult on the bus during the April attack, which allegedly occurred in his plain view. Despite being alerted to the assault by Student T., Parciasepe continued to drive the bus. (Doc. 10, Am. Compl. ¶¶ 83, 84, 138). An ESASD employee in his position would be expected to actively supervise young children who had special needs on a school bus. "The state is responsible for the safety of very young children unable to care for themselves. Indeed, it is a responsibility the state undertakes when young children are left in its care." L.R., 836 F.3d at 244.

Given these allegations, a reasonable inference may be drawn that Parciasepe, like Robins, affirmatively misused his authority. Placing J.M., a non-verbal six-year-old with severe intellectual disabilities across the aisle on a school bus from another child with known violent tendencies and behavioral issues made J.M. less safe than providing no bussing system at all. Doe, 2025 WL 19819, at *4. For this reason, the fourth element of the state-created danger doctrine has been satisfied.

### ii.    Remaining Elements of State-Created Danger

As for the remaining elements of the state-created danger doctrine,
namely: 1) foreseeable and fairly direct harm; 2) a degree of culpability that
shocks the conscience; 3) and a relationship with the state making the plaintiff a
foreseeable victim, these elements will be addressed together as they arise from
the same set of allegations.

Regarding the first element, the inquiry is whether the harm ultimately
caused was a foreseeable and a fairly direct result of the state's actions. L.R.,
836 F.3d at 245.  The foreseeability component of the first element is established
if a state actor "knew, or should have known, about the risk of his actions."[9] Id.

Starting with Robins, as inferred from the allegations, she was aware of
Student A.'s behavioral issues and violent tendencies. (Doc. 10, Am. Compl. ¶
156, 174, 179).  After the March incident, she received pictures of J.M.'s scratch
marks and multiple requests to move J.M.'s bus seat. (Id. ¶¶ 58, 69).  Plaintiffs'
allegations support the inference that Robins knew or should have known that
placing J.M. on the same bus with Student A. while strapped in his seat without
any protective measures increased the risk of harm to him.  As for Parciasepe, it

---

[9] "[A] plaintiff must only 'allege an awareness on the part of the state actors that rises to the
level of actual knowledge *or an awareness of risk* that is sufficiently concrete to put the actors
on notice of the harm.' " L.R., 836 F.3d at 245 (quoting Phillips, 515 F.3d at 238 (cleaned up)).

could be inferred from the amended complaint that he was aware of Student A.'s behavioral issues and that J.M. was unable to protect himself. (Doc. 10, Am. Compl. ¶ 83).  Nevertheless, Parciasepe continued to operate the bus during the April attack.  Thus, a reasonable inference could be drawn from plaintiffs' allegations that Parciasepe knew or should have known that continuing to drive the bus while J.M. was being beaten could result in harm to J.M.  Therefore, plaintiffs have plausibly alleged foreseeability as to both Robins and Parciasepe.  Additionally, these allegations also establish that the attack on J.M. was a fairly direct result of Robins' and Perciasepe's actions.[10]  Hence, plaintiffs' allegations satisfy the first element of the state-created danger doctrine.

Moving to the second element, that is, conscience shocking conduct, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8 (1998).  The analysis here depends largely on the circumstances of the case.[11] Phillips, 515

---

[10] "Although this inquiry is fact-specific, a distinction exists between harm that occurs to an identifiable or discrete individual . . . and harm that occurs to a random individual with no connection to the harm-causing party." L.R., 836 F.3d at 245 (quoting Phillips, 515 F.3d at 239 (cleaned up)).

[11] "Under Sanford, three possible standards can be used to determine whether state action shocked the conscience: (1) deliberate indifference; (2) gross negligence or arbitrariness that indeed shocks the conscience; or (3) intent to cause harm." Phillips, 515 F.3d at 241 (citing Sanford v. Stiles, 456 F.3d 298, 306 (3d Cir. 2006)).

F.3d at 240.  Nothing in the amended complaint indicates that Defendants

Robins or Parciasepe faced circumstances requiring them to make a quick

decision.  Consequently, the culpability standard applicable here is deliberate

indifference.  "[D]eliberate indifference might exist without actual knowledge of a

risk of harm when the risk is so obvious that it should be known."[12] Phillips, 515

F.3d at 241 (quoting Sanford, 456 F.3d at 309).

Based on plaintiffs' allegations, Robins and Parciasepe consciously

disregarded a substantial risk of serious harm to J.M.  As a result of their

deliberate indifference, it is asserted that J.M. suffered a foreseeable and violent

attack on April 25, 2022, resulting in permanent disabling injuries. (See Doc. 10,

Am. Compl. ¶¶ 92, 138, 156, 174, 176). These allegations support the inference

that Robins's and Parciasepe's actions rose to the level of conscience-shocking

behavior. Therefore, this element is met.

---

"The time in which the government actors had to respond to an incident is of particular significance." Id. at 240. "In a hyperpressurized environment, such as a high-speed police chase, intent to harm is required. But in situations where deliberation is possible and officials have the time to make unhurried judgments, deliberate indifference is sufficient." L.R., 836 F.3d at 246 (quoting Sanford, 456 F.3d at 309)). Moreover, "where the circumstances require a state actor to make something less exigent than a split-second decision but more urgent than an unhurried judgment," courts must apply the "gross negligence or arbitrariness" standard. Phillips, 515 F.3d at 241 (cleaned up).

[12] Deliberate indifference requires a "conscious disregard of a substantial risk of serious harm." Vargas v. City of Philadelphia, 783 F.3d 962, 973–74 (3d Cir. 2015) (quoting Ziccardi v. City of Philadelphia, 288 F.3d 57, 66 (3d Cir. 2002) (cleaned up)).

As to the third element of the state-created danger doctrine, it requires the existence of a relationship with the state actor making J.M. a foreseeable victim of the state actor's conduct. L.R., 836 F.3d at 247. This element "contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense."[13] Phillips, 515 F.3d at 242 (citation omitted).

Here, J.M. was an ESASD student enrolled in a special educational needs classroom. (Doc. 10, Am. Compl. ¶ 33). Due to his disabilities, J.M. rode an ESASD bus composed entirely of students with special needs, including children with documented behavioral issues. (Id. ¶ 35). Robins, ESASD's transportation director, and Parciasepe, ESASD bus driver, were both responsible for the transport of J.M. to and from school. They were both allegedly aware of Student A.'s behavioral issues. These allegations support the inference that a relationship existed between J.M. and Defendants Robins and Parciasepe making J.M. a foreseeable victim.

Accordingly, at this early stage of the proceedings, plaintiffs have plausibly alleged the elements required to proceed on a state-created danger claim against Robins and Parciasepe.

---

[13] The relationship between the state and the plaintiff could be "merely that the plaintiff was a foreseeable victim, individually or as a member of a distinct class. Such a relationship may exist where the plaintiff was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." Phillips, 515 F.3d at 242.

## 2. Qualified Immunity of Robins and Parciasepe

Having concluded that plaintiffs have sufficiently alleged a violation of their son's substantive due process rights against Robins and Parciasepe, the next inquiry is whether the right was clearly established at the time of the state actions. The discussion that follows centers on Defendants Robins and Parciasepe since the amended complaint contains factual allegations solely pertaining to their conduct.

The main purpose of qualified immunity is to shield public officials "from undue interference with their duties and from potentially disabling threats of liability." Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982). Nevertheless, this immunity may be overcome when a public official violates clearly established constitutional rights of which a reasonable person would have been aware. Id. at 818. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al–Kidd, 563 U.S. 731, 743 (2011) (cleaned up).

To resolve a claim of qualified immunity, courts apply a two-pronged inquiry: "(1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct." L.R., 836 F.3d at 241 (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)). "[W]hether a particular complaint sufficiently alleges a

clearly established violation of law cannot be decided in isolation from the facts pleaded." Id. (quoting Ashcroft, 556 U.S. at 673).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft, 563 U.S. at 741 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The ultimate inquiry is whether the state of the law when the offense occurred gave the state official fair warning that her alleged treatment of the plaintiff was unconstitutional. L.R., 836 F.3d at 247 (citation omitted).

When determining the right at issue, courts must frame the right "in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001).  The main question "is whether the violative nature of particular conduct is clearly established." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting Ashcroft, 563 U.S. at 742).  However, this does not mean "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." Anderson, 483 U.S. at 640. "Rather, the proper inquiry [is] whether the facts averred by the [plaintiff] fall within the elements of the state-created danger theory, and whether it would be clear to a reasonable state official that his conduct was unlawful under the

circumstances." <u>L.R.</u>, 836 F.3d at 248 (quoting <u>Est. of Lagano v. Bergen Cnty.</u>

<u>Prosecutor's Off.</u>, 769 F.3d 850, 859 (3d Cir. 2014) (cleaned up)).

Plaintiffs here base their allegations on J.M.'s substantive due process

right to bodily integrity under the Due Process Clause of the Fourteenth

Amendment. (Doc. 10, Am. Compl. ¶ 116). "Individuals have a broad substantive

due process right to be free from unjustified intrusions on personal security" in

the context of the state-created danger doctrine. <u>L.R.</u>, 836 F.3d at 249 (citation

omitted). According to the Third Circuit, "an individual's right to not be removed

from a safe environment and placed into one in which it is clear that harm is likely

to occur, particularly when the individual may, due to youth or other factors, be

especially vulnerable to the risk of harm" has been clearly established. <u>Id.</u> The

Third Circuit has emphasized that this holds true even in the absence of a case

directly mirroring the facts at issue, so long as sufficiently analogous precedent

would have placed a reasonable official on notice that her actions were unlawful.

<u>Id.</u>

In <u>L.R.</u>, the Third Circuit cited a Tenth Circuit case holding that a plaintiff

adequately pled a state-created danger claim where state social workers failed to

investigate numerous allegations of child abuse and recommended that the

children's abusive father assume legal custody. 836 F.3d at 250 (citing <u>Currier v.</u>

<u>Doran</u>, 242 F.3d 905 (10th Cir. 2001)). The social workers in <u>Currier</u> were

denied qualified immunity because "a reasonable state official at the time would have known that reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional." Id. (quoting Currier, 242 F.3d at 924)).

According to the amended complaint here, J.M., a minor child with non-verbal autism and intellectual disabilities, was placed on an ESASD bus, strapped in his seat, with other special needs students with violent tendencies and behavioral issues during both incidents. (Doc. 10, Am. Compl. ¶¶ 34, 42, 74). After being alerted by S.M. that Student A. allegedly attacked J.M. on the bus on March 8, Robins failed to investigate the incident. (Id. ¶¶ 69, 70, 144). Robins also failed to change J.M.'s seating arrangement even after S.M. emailed Robins pictures of J.M.'s scratch marks and requested a seat change on the bus multiple times to be near the driver. (Id. ¶¶ 58, 69). Then, on April 25, 2022, Student A. attacked J.M. again. Based on these allegations, a reasonable state official in Robins's position would have understood that permitting J.M. to be placed on the same bus as Student A. without taking any action to protect the child could lead to a deprivation of J.M.'s substantive due process rights.

As to Parciasepe, he allegedly continued to drive the bus on April 25, 2022 while observing the attack on J.M. and despite being alerted by Student T. that J.M. was being beaten. (Id. ¶¶ 83, 84, 138). Parciasepe witnessed the attack yet

31

failed to intervene or take steps to protect J.M. (Id. ¶¶ 83, 94).  A reasonable

state official in Parciasepe's position should have understood that his behavior

could result in a deprivation of J.M.'s substantive due process rights, especially

when J.M. was restrained while being punched about the face and head by

another child.

Even if further details may ultimately be required to assess the totality of

the circumstances, the highly fact-intensive nature of this inquiry makes dismissal

at this stage unwarranted.  The amended complaint sets forth sufficient

allegations that, if proven, demonstrate that despite an awareness of the risk,

Robins and Parciasepe ignored the risk and exercised their authority as state

officials to render J.M. more vulnerable to harm.  Although there appears to be

no factually identical binding precedent, at this juncture, the court concludes that

there were sufficient facts alleged that Robins and Parciasepe were on notice of

a serious risk such that their conduct would be unlawful under the circumstances.

For these reasons, Robins and Parciasepe are not entitled to qualified immunity

and defendants' motion to dismiss plaintiffs' due process claims based on the

state-created danger doctrine in Count I will be denied.

### 3. Defendants Moriarty and Riker

According to defendants, the amended complaint fails to set forth any

specific allegations against the school superintendent William Riker or the school

32

principal Jennifer Moriarty. (Doc. 16, Br. in Supp. at 17).  The court agrees with

defendants.  The amended complaint includes only generalized allegations that

by virtue of their respective roles, Riker and Moriarty were responsible for

overseeing Defendant Parciasepe. (Doc. 10, Am. Compl. ¶¶ 17-18).

The Third Circuit has explained that, in civil rights actions, a defendant may

be held liable only for his own personal involvement in the alleged misconduct,

not under a theory of *respondeat superior*.  Rode, 845 F.2d at 1207 (citing Parratt

v. Taylor, 451 U.S. 527, 537 n. 3 (1981); Hampton v. Holmesburg Prison Offs.,

546 F.2d 1077, 1082 (3d Cir.1976)). "Personal involvement can be shown

through allegations of personal direction or of actual knowledge and

acquiescence." Id.  Nonetheless, "[a]llegations of participation or actual

knowledge and acquiescence . . . must be made with appropriate particularity."

Id.

Here, the sole factual allegation referencing Defendant Moriarty is that she

advised T.M. after the April incident that any privacy concerns related to video

surveillance could be addressed by blurring faces. (Id. ¶ 89).  This followed

Robins's earlier statement that she could not share the footage from March due

to privacy concerns. (Id. at ¶ 88).  As to Defendant Riker, the amended complaint

contains no particularized allegations implicating him.  Under Rode, plaintiffs'

allegations against Riker and Moriarty are insufficient to state a claim or

33

otherwise justify them remaining as defendants in this action.  Moreover, plaintiffs

failed to respond to defendants' arguments on this issue.  Accordingly, the

Section 1983 claims against Defendants Riker and Moriarty will be dismissed

without prejudice.

### 4. Defendant CIU20

As discussed above, Defendant CIU20 is the Intermediate Unit that

provided specialized education to students with special needs enrolled within

ESASD. (Doc. 10, Am. Compl. ¶ 28).  With respect to this defendant, plaintiffs

allege that, prior to both incidents, CIU20 unilaterally transferred J.M. from his

previous school to a classroom at Middle Smithfield Elementary School. (Id. ¶

177).  According to plaintiffs, this transfer occurred without the request or consent

of J.M.'s parents and resulted in his placement on a different school bus with

Student A. (Id. ¶¶ 177, 178).  Plaintiffs assert that as a result of the unilateral

transfer of J.M. to a new classroom—which resulted in his assignment to a

different bus with children with behavioral issues and violent tendencies—CIU20

placed J.M. in immediate peril of suffering the precise type of violent attack that

occurred on March 8 and April 25, 2022. (Id.)

Defendant CIU20 argues that plaintiffs' allegations regarding the unilateral

transfer of J.M. to a new classroom misstate the law regarding Local Educational

Agencies and Intermediate Units.  Per CIU20, ESASD is the Local Educational

Agency ("LEA") responsible for J.M.'s free appropriate public education pursuant to 22 PA. CODE § 14.102. (Doc. 16, Br. in Supp. at 10). Defendant CIU20 asserts that Intermediate Units such as CIU20 are only considered the LEA for school-aged children with disabilities enrolled by their parents in private schools as detailed by 22 PA. CODE § 14.103. (Id.)   Hence, CIU20 argues that it lacks authority to make unilateral decisions concerning J.M.'s education or his needs. (Id.)  Moreover, CIU20 asserts that it was ESASD that provided transportation to J.M. and that the bus drivers were employees of ESASD, not of CIU20. (Id.) Plaintiffs did not respond to these arguments in their brief in opposition.

Defendant CIU20 thus requests dismissal from this action on the ground that it is not a LEA.  According to Defendant CIU20, apart from plaintiffs' allegations asserted against this defendant that it unilaterally transferred J.M. from his previous school to a classroom at Middle Smithfield Elementary School, the amended complaint identifies no conduct by CIU20 related to the two incidents that occurred on the bus.  After review of the amended complaint, the court agrees with Defendant CIU20.  Moreover, plaintiffs have not responded to this argument either.  Thus, the motion to dismiss Defendant CIU20 will be deemed unopposed.  Defendant CIU20 is subject to dismissal from this action.

### c. Municipal Liability: <u>Monell</u> Claims Against ESASD

As for plaintiffs' due process claim against ESASD, defendant argues that such claim fails to satisfy the requirements set forth in <u>Monell</u> and subsequent case law clarifying the boundaries of municipal liability.[14]  (Doc. 16, Br. in Supp. at 7-8).  Under the law, a municipality like ESASD cannot be held liable under Section 1983 solely on a *respondeat superior* theory of liability. <u>Monell</u>, 436 U.S at 691.  Rather, ESASD is liable only for injuries caused by a municipal policy or custom. <u>Id.</u> at 690–91.

Defendant asserts that the amended complaint fails to identify any policy or custom of ESASD sufficient to establish municipal liability. (Doc. 16, Br. in Supp. at 8).  Plaintiffs take the opposite view. (Doc. 20, Br. in Opp. at 6).  They assert two theories of liability.  First, plaintiffs allege that ESASD was responsible for ensuring Defendant Parciasepe, its bus driver, was adequately trained to provide students with a safe environment while travelling on ESASD buses. (Doc. 10, Am. Compl. ¶ 39).  Second, plaintiffs attempt to advance a policy or custom theory by contending that Defendant Robins, the ESASD's transportation safety director, disregarded warnings from J.M.'s mother regarding J.M.'s lack of safety

---

[14] This analysis would also apply to the Section 1983 claims against Defendant CIU20 had that defendant not already been dismissed.

on the bus. (Id. ¶¶ 58, 67-70).  The court will address plaintiffs' two theories of

liability in turn.

####           i.           Failure to Train

Municipal liability may be alleged in several ways under existing precedent.

Under certain circumstances, a municipality may violate Section 1983 by failing

to train or supervise its employees. City of Canton, Ohio v. Harris, 489 U.S. 378,

380 (1989); Forrest v. Parry, 930 F.3d 93, 105 (3d Cir. 2019); Est. of Roman v.

City of Newark, 914 F.3d 789, 798–99 (3d Cir. 2019).  To satisfy Section 1983, a

municipality's failure to train or supervise its employees in a relevant respect

must be caused by an inadequacy that reflects deliberate or conscious choice,

Forrest, 930 F.3d at 105, or amount to "deliberate indifference to the rights of

persons with whom the [untrained employees] come into contact[,]" Connick v.

Thompson, 563 U.S. 51, 61 (2011) (quoting City of Canton, 489 U.S. at 388)).  "A

plaintiff sufficiently pleads deliberate indifference by showing that '(1) municipal

policymakers know that employees will confront a particular situation[,] (2) the

situation involves a difficult choice or a history of employees mishandling[,] and

(3) the wrong choice by an employee will frequently cause deprivation of

constitutional rights.' " Est. of Roman, 914 F.3d at 798 (quoting Doe v. Luzerne

Cnty., 660 F.3d 169, 180 (3d Cir. 2011) (internal quotation marks omitted)).

Section 1983 plaintiffs must also demonstrate that the defendants' actions were

the proximate cause of the violation of their federally protected right. <u>Rivas v. City of Passaic</u>, 365 F.3d 181, 193 (3d Cir. 2004).

Here, the amended complaint fails to allege the requisite elements necessary to establish ESASD's municipal liability for failure to train or supervise Defendant Parciasepe.  Plaintiffs assert that on April 25, 2022, Defendant Parciasepe observed the violent attack on J.M. but took no action to protect him. (Doc. 10, Am. Compl. ¶ 83).  Per plaintiffs, Parciasepe knew the attack was occurring and was aware of Student A.'s behavioral issues. (<u>Id.</u>)  Plaintiffs further allege that Parciasepe failed to intervene even after Student T., another student on the bus, informed him that Student A. was severely beating J.M. (<u>Id.</u> ¶¶ 84, 85).  In addition, Parciasepe allegedly failed to inform J.M.'s father, T.M., about the incident when he noticed his son's bloody nose upon leaving the bus. (<u>Id.</u> at ECF p. 24).  Instead, Parciasepe allegedly led T.M. to believe that his son suffered from a spontaneous nosebleed on the bus. (<u>Id.</u>)  The following day, ESASD allegedly suspended Parciasepe with pay for his failure to intervene and protect J.M. (<u>Id.</u>)  That same day, Parciasepe purportedly called T.M and apologized for not informing him of the incident. (<u>Id.</u> ¶ 91).

These allegations, however, are insufficient to establish that ESASD's failure to train or supervise Parciasepe resulted from an inadequacy reflecting deliberate or conscious choice, or that ESASD's conduct amounted to deliberate

38

indifference to the rights of students, such as J.M.  The amended complaint has not pled that (1) ESASD policymakers were aware that their employees would confront a particular situation; (2) the situation would involve a difficult choice or a history of employees mishandling; or (3) the wrong choice by an employee would frequently result in the deprivation of constitutional rights.  Thus, plaintiffs' failure-to-train claim against ESASD cannot stand on its own. See Kneipp, 95 F.3d at 1212 n.26.

### ii.    Policy or Custom

To further their municipal liability claim, plaintiffs contend that Defendant Robins, ESASD's transportation safety director, disregarded repeated warnings from S.M. that her son, J.M., had sustained significant scratch marks on March 8, 2022 on his body and that she suspected he was the victim of a physical assault on the school bus. (Doc. 10, Am. Compl. ¶¶ 58, 67-70).  Plaintiffs allege that S.M. emailed Robins multiple times requesting that ESASD investigate the March 8 incident and change J.M.'s seat on the bus to ensure his safety. (Id. ¶¶ 58, 69).  Nevertheless, per plaintiffs, ESASD and Robins deliberately ignored these documented concerns. (Id. ¶¶ 70, 72).  Plaintiffs assert that these allegations are sufficient to establish an ESASD policy or custom to disregard known risks of student-on-student harassment. (Doc. 20, Br. in Opp. at 9).

Under the law, plaintiffs may proceed against a municipality where the unconstitutional action alleged "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell, 436 U.S. at 690. However, plaintiffs here do not reference any paper policy adopted or promulgated by ESASD in their amended complaint.

Among the ways a municipal liability case may proceed are allegations implicating: 1) "the decisions of a government's lawmakers"; 2) "the acts of its policymaking officials"; and 3) "practices so persistent and widespread as to practically have the force of law[,]" which constitute "official municipal policy[.]" Connick, 563 U.S. at 61 (citing Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986) (plurality opinion); Adickes v. S.H. Kress & Co., 398 U.S. 144, 167–68 (1970)).

Regarding the three options outlined in Connick, the amended complaint fails to allege facts supporting any one of them. With respect to the first and second options, the amended complaint lacks factual allegations suggesting that any relevant decision or act was made by government policymakers, such as the school board or superintendent.[15] As discussed in the previous section, the

---

[15] Pennsylvania's Public School Code of 1949 ("School Code"), 24 PA. STAT. §1-101, *et seq.* and its attendant regulatory scheme governs the hierarchy of public school administration in the Commonwealth. Generally, "the public school system of the Commonwealth shall be administered by a board of school directors[.]" 24 PA. STAT. § 3-301.

amended complaint lacks factual allegations against ESASD's superintendent William Riker.  As for the principal, Jennifer Moriarty, and the transportation director, Damaris Robins, whether these school officials "speak with final policymaking authority for the [school district] concerning the action alleged to have caused the particular constitutional ... violation at issue" is a question of state law. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989).  State law reflects that school boards and superintendents are final policymakers depending on the type of action alleged, not school principals, see McGreevy v. Stroup, 413 F.3d 359, 368–69 (3d Cir. 2005) (discussing Pennsylvania's School Code), or, for that matter, transportation directors.

The law would permit recovery if the plaintiffs here could prove that the school board or superintendent ratified unconstitutional decisions of school officials such as Defendants Moriarty or Robins or delegated powers to them to make those decisions. See Kelly v. Borough of Carlisle, 622 F.3d 248, 264 (3d Cir. 2010) (citing LaVerdure v. Cnty. of Montgomery, 324 F.3d 123, 125 (3d Cir. 2003)); see also City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).

With respect to Moriarty, the amended complaint fails to allege any conduct on her part regarding either incident.  Even assuming *arguendo* that it did, plaintiffs have not alleged that the school board or Superintendent Riker ratified

any unconstitutional decisions of Moriarty or delegated policymaking authority to her.

As for Robins, ESASD's transportation director, the amended complaint contains sufficient factual allegations implicating her in the March and April incidents.  Nevertheless, plaintiffs do not allege that Robins possessed any policymaking authority. The amended complaint merely asserts that Robins was authorized by ESASD to perform her duties, including the supervision of Defendant Parciasepe. (Doc. 10, Am. Compl. ¶19).  The amended complaint does not allege that Robins herself was a final policymaker or that the school board or superintendent delegated powers to her.  Nor do the parties' submissions address whether Robins had policymaking authority.  For these reasons, Robins will not be deemed a policymaker for purposes of establishing municipal authority.  Consequently, the plaintiffs cannot proceed on allegations related to the acts of the ESASD's policymaking officials.

The third Connick option pertains to the theory of municipal liability which focuses on governmental customs. See Monell, 436 U.S. at 690–91 ("local governments… may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); Est. of Roman, 914 F.3d at 798 (explaining that, with a custom, a plaintiff is not required to prove

formal approval by the municipality) (citation omitted).  To succeed on this theory, a plaintiff must first identify a custom.  Second, that custom must be "so widespread as to have the force of law." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 404 (1997) (citing Monell, 436 U.S. at 690–91; Adickes, 398 U.S. at 167–68)).  Third, a plaintiff must demonstrate "an 'affirmative link' between the…custom and the particular constitutional violation he alleges." Est. of Roman, 914 F.3d at 798 (quoting Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990)).  That affirmative link may be proven by showing that the municipality had knowledge of similar unlawful conduct in the past, failed to take precautions against future violations, and that the municipality's failure, at least in part, led to the plaintiff's injury. See id. (citation omitted).

Plaintiffs have not identified any custom on the part of ESASD involving the non-enforcement of a specific policy or the failure to take affirmative action to address student-on-student harassment.  Although plaintiffs allege that J.M. was restrained in his seat and was attacked by Student A. on two separate occasions, these allegations do not support the existence of an ESASD custom of disregarding reports of student-on-student harassment or physical abuse of students with disabilities.  These allegations also do not amount to "persistent and widespread" practices "so permanent and well settled as to constitute a 'custom or usage' with the force of law." Monell, 436 U.S. at 691 (quoting

43

Adickes, 398 U.S. at 167–68)).  There are no other allegations in the amended complaint suggesting a pattern of deliberate inaction amounting to a custom of failing to address student-on-student harassment.  Therefore, plaintiffs' allegations fail to satisfy the municipal liability requirements under Monell.

## II.    Section 504 of the Rehabilitation Act

Defendants also move to dismiss plaintiffs' Section 504 claims in Count II of the amended complaint.  According to defendants, plaintiffs' Section 504 claims are barred pursuant to a Settlement Agreement and Release ("SAR" or "Agreement") plaintiffs entered into with ESASD on February 27, 2023. (Doc. 16, Br. in Supp. at 21).  Defendants attached the SAR to their brief in support of their motion to dismiss. (Doc. 16-1, Ex. A).  Plaintiffs allegedly entered into the SAR with ESASD after they filed a special education due process complaint. (Doc. 16, at 20-21).   Defendants argue that plaintiffs explicitly waived their ability to bring causes of action under Section 504 and other relevant laws in the SAR. (Id.) Alternatively, defendants assert that Count II must be dismissed because plaintiffs failed to substantiate intentional discrimination. (Id. at 22).

First, the complaint does not mention the SAR or any settlement agreement between plaintiffs and ESASD.[16]  Second, defendants appear to assert claim

---

[16] Under the law, courts may "generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" when deciding a Rule 12(b)(6) motion. Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192,

preclusion, also known as *res judicata*, against plaintiffs as to their Section 504 claim. (Id. at 21 n.2). Given that the complaint never mentioned any agreement with ESASD, the basis of a *res judicata* defense is not evident on the face of the complaint.[17] At this juncture, the court will defer ruling on this issue until the parties complete discovery.

However, plaintiffs' Section 504 claims will not proceed against all defendants. Such a finding is warranted because, as previously discussed in Section (I)(b)(4), CIU20 will be dismissed from this action. As for Defendants Riker, Moriarty, Robins, or Parciasepe, "[s]uits may be brought pursuant to

---

1196 (3d Cir. 1993) (citations omitted). A court may also consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Id. (citations omitted). Furthermore, where a document is integral to or explicitly relied upon in the complaint, it may be considered without converting a motion to dismiss for failure to state a claim into one for summary judgment under Rule 56. Doe v. Princeton Univ., 30 F.4th 335, 343 (3d Cir. 2022) (citations and internal quotation marks omitted).

[17] As the Third Circuit Court of Appeals has stated, "an affirmative defense will serve as grounds for a Rule 12(b)(6) dismissal *only* if the basis for the defense is evident on the face of the complaint." Brody v. Hankin, 145 F. App'x 768, 771 (3d Cir. 2005). In other words, if a *res judicata* bar (claim preclusion) "is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." Id. at 771-72 (quoting Rycoline Prods., Inc. v. C & W Unlimited, 109 F.3d 883, 886 (3d Cir. 1997)).

When the basis for a *res judicata* defense is not apparent on the face of the complaint, the court cannot rely on facts and documents from prior proceedings that were not mentioned in, or attached to, the complaint. Brody, 145 F. App'x at 772. In such circumstances, a district court could pursue either of the following procedures: 1) deny the motion without prejudice to renew it in the form of a motion for summary judgment pursuant to Rule 56; or 2) convert the Rule 12(b)(6) motion into a Rule 56 motion and afford "all parties ... reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Rycoline Prods., 109 F.3d at 886–87.

Section 504 against recipients of federal financial assistance, but not against individuals." A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 804 (3d Cir. 2007). From the allegations set forth in the amended complaint, it does not appear that the individual defendants were "in a position to accept or reject" federal funding. Id. Consequently, defendants' motion to dismiss plaintiffs' Section 504 claims will be granted in part and denied in part, and Count II will only proceed against ESASD.

## III.    The Pennsylvania's Political Subdivision Tort Claims Act

The amended complaint also asserts claims against certain defendants under state tort law.  Specifically, Count III asserts IIED claims against Defendants ESASD, Damaris Robins, and Rudolph Parciasepe.  Furthermore, Count IV advances negligence claims against Defendants ESASD, Damaris Robins, Rudolph Parciasepe, and CIU20.  These defendants assert that they are immune from all tort claims asserted in the amended complaint pursuant to the Pennsylvania's Political Subdivision Tort Claims Act, 42 PA. CONS. STAT. §§ 8541–42. ("PSTCA"). (Doc. 16, Br. in Supp. at 25).

Local agencies and governments such as school districts are generally immune from tort liability under the PSTCA.  See Sanford, 456 F.3d at 315 ("[L]ocal agencies such as school districts are given broad tort immunity."); Wells v. Harrisburg Area Sch. Dist., 884 A.2d 946, 948 (Pa. Commw. Ct. 2005).

Pursuant to Section 8541 of the PSTCA, "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person[,]" except as otherwise provided in the PSTCA. 42 PA. CONS. STAT. § 8541. Section 8542 provides exceptions to that immunity under certain circumstances. See Zauflik v. Pennsbury Sch. Dist., 104 A.3d 1096, 1100 (Pa. 2014).

Generally, the Federal Rules of Civil Procedure require defendants to plead affirmative defenses in their answer, not in a motion to dismiss. Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (citation omitted). However, an affirmative defense may be raised in a motion to dismiss if the defense is apparent on the face of the complaint. Lupian v. Joseph Cory Holdings LLC, 905 F.3d 127, 130 (3d Cir. 2018); Rycoline Prods., 109 F.3d at 886–87; Bethel v. Jendoco Constr. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978).

The immunity provided by the PSTCA is an affirmative defense. See Gale v. City of Philadelphia, 86 A.3d 318, 319, n. 1 (Pa. Commw. Ct. 2014). Thus, that defense must be apparent from the face of the amended complaint for the court to consider the defendants' PSTCA immunity arguments. Because this case involves tort claims against a Pennsylvania public school district, defenses under the PSTCA are "manifest in the complaint itself." Cf. In re Asbestos Prods. Liab. Litig. (No. VI), 822 F.3d 125, 133 n. 6 (3d Cir. 2016) (discussing the

application of federal preemption defenses at the Rule 12(b)(6) stage).

Accordingly, the court will consider the PSTCA defenses on a motion to dismiss.

The PSTCA bars any state tort claims against local agencies unless those claims fall within one of nine defined areas.[18] 42 PA. CONS. STAT. §§ 8541–42. Defendants argue that plaintiffs failed to plead facts supporting any of the exceptions. (Doc. 16, Br. in Supp. at 26). Plaintiffs counter that the vehicle liability exception applies in this case.

Relative to the vehicle liability exception, Section 8542 of the PSTCA provides:

> (a) **Liability imposed.** -- A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):
>
> (1)   The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and
>
> (2)   The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one

---

[18] Those categories, which provide exceptions to immunity, are: 1) vehicle liability; 2) care, custody, or control of personal property; 3) real property; 4) trees, traffic control, and street lighting; 5) utility service facilities; 6) streets; 7) sidewalks; 8) care, custody, or control of animals; and 9) sexual abuse. 42 PA. CONS. STAT. § 8542(b)(1)-(9).

of the categories listed in subsection (b). As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.

(b) **Acts which may impose liability.** -- The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency: . . .

(1) *Vehicle liability.*--The operation of any motor vehicle in the possession or control of the local agency, provided that the local agency shall not be liable to any plaintiff that claims liability under this subsection if the plaintiff was, during the course of the alleged negligence, in flight or fleeing apprehension or resisting arrest by a police officer or knowingly aided a group, one or more of whose members were in flight or fleeing apprehension or resisting arrest by a police officer. As used in this paragraph, "motor vehicle" means any vehicle which is self-propelled and any attachment thereto, including vehicles operated by rail, through water or in the air.

42 Pa. Cons. Stat. § 8542(a)-(b), (b)(1).

Defendants argue that the vehicle liability exception is specific to the driver's operation of the vehicle, not the actions of others who happen to be on the vehicle while it is operating. (Doc. 16, Br. in Supp. at 29). Plaintiffs counter that the two separate incidents of alleged physical abuse occurred while J.M. was being transported on an ESASD bus. (Doc. 20, Br. in Opp. at 30). Per plaintiffs, J.M. allegedly sustained his injuries on the school bus while it was in motion. (Id.) Furthermore, plaintiffs contend that the bus driver, Defendant

Parciasepe, deliberately chose to continue driving rather than stop the bus upon seeing J.M. being attacked by Student A. (Id. at 31; Doc. 10, Am. Compl. ¶¶ 80-85, 138). According to plaintiffs, this decision permitted the attack to continue as J.M. was repeatedly beaten about the head and face. (Id.) After reviewing Pennsylvania law, plaintiffs' argument is more persuasive.

"Operation" in this exception, as explained by the Pennsylvania Supreme Court, is not limited to mobility, but rather "reflects a continuum of activity, which entails a series of decisions and actions, taken together, which transport the individual from one place to another." Balentine v. Chester Water Auth., 648 Pa. 105, 123, 191 A.3d 799 (2018) (internal quotations and citations omitted). For instance, "[t]he decisions of where and whether to park, where and whether to turn, whether to engage brake lights, whether to use appropriate signals, whether to turn lights on or off, and the like, are all part of the 'operation' of a vehicle." Id.

In so ruling in Balentine, the Supreme Court of Pennsylvania overruled Love v. City of Philadelphia, 543 A.2d 531 (Pa. 1988), and abrogated thirty years of jurisprudence regarding a narrow definition of "operation" under 42 Pa. Cons. Stat. § 8542(b)(1). Under Balentine, the old "definition has impeded the development of consistent and logical case law" because "[w]here accidents occur involving vehicles that are stopped or parked, the courts have held that immunity applies . . . . [h]owever, where the parked vehicle resumes movement .

50

. . the Commonwealth Court has held that the exception to immunity is triggered." 191 A.3d at 808. According to the Pennsylvania Supreme Court, " 'operation' of a motor vehicle occurs in other statutory provisions and in those cases, we have not required that the term 'operation' means that the automobile actually be in motion." Id. at 809. Furthermore, "in the context of the offense of driving under the influence (DUI) . . . to find that a motor vehicle is in operation requires evidence that the driver was in actual physical control of the vehicle, but not that the vehicle was actually 'in motion.' " Id. The Pennsylvania Supreme Court observed in Balentine that the new definition of "operation" "creates a reasonable standard that comports with the intent of the General Assembly and avoids the illogical results that have flowed from the emphasis on motion in Love and its progeny." Id. at 810.

In light of the Supreme Court of Pennsylvania's decision in Balentine and its adoption of a broader definition of "operation," the vehicle liability exception to governmental immunity applies here. As alleged in the amended complaint, Parciasepe was in actual physical control of the bus on April 25, 2022 and operated it while Student A. attacked J.M. in his plain view. Accordingly, J.M.'s injuries occurred during the operation of the bus. (Doc. 10, Am. Compl. ¶¶ 131, 160). At this juncture, these allegations are sufficient to support the applicability of the vehicle liability exception.

51

Nonetheless, the inquiry does not end here.  Plaintiffs must state plausible claims against the defendants by pleading facts alleging: "(1) that the government would have been liable under common law or statute for the injury; (2) that the injury was caused by the negligent act of the government or its agent acting within the scope of his duties; and (3) that the negligent act falls within one of the exceptions to immunity enumerated in subsection 8542(b) of the Judicial Code [.]" Balentine, 191 A.3d at 809.

### a. IIED

As indicated above, Count III asserts IIED claims against ESASD, Robins, and Parciasepe.  To plead an IIED claim, a plaintiff must set forth facts supporting four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." Jordan v. Pennsylvania State Univ., 276 A.3d 751, 775 (Pa. Super. Ct. 2022) (citations omitted).

### i.    ESASD

Plaintiffs bring an IIED claim against ESASD based on the conduct of Parciasepe, its bus driver employee, and Robins, its transportation director.[19]

---

[19]  Plaintiffs argue that strapping and restraining J.M. in his bus seat constitute outrageous conduct. (Doc. 20 Br. in Opp. at 32).  As previously discussed in this memorandum, these allegations pertain to J.M.'s accommodations which his parents have presumably consented to.  Moreover, plaintiffs do not allege that school officials imposed transportation accommodations on J.M. without his parents' consent in violation of the law. Therefore, these allegations will not be addressed in the IIED analysis.

Focusing on Parciasepe's conduct, per plaintiffs, Parciasepe deliberately failed to protect J.M. during the April incident, and thereby he intentionally caused emotional distress to J.M. and his parents. (Doc. 10, Am. Compl. ¶¶ 131, 133, 138). "Such intentional acts of an employee acting within the scope of his office are specifically excluded from imposing liability upon the local agency by the language of Section 8542(a)(2)." <u>Steiner by Steiner v. City of Pittsburgh</u>, 509 A.2d 1368, 1370 (Pa. Commw. Ct. 1986).

Specifically, Section 8550 of the PSTCA exposes the employees of a local agency to personal liability upon a judicial determination that the employee's act constituted a "crime, actual fraud, actual malice or willful misconduct" but does not impose liability on the local agency for such conduct. 42 PA. CONS. STAT. § 8550; <u>Steiner by Steiner</u>, 509 A.2d at 1370. "While Section 8550 indeed waives four specific immunities for willful misconduct, each of the waived immunities exposes municipal employees to *personal* liability without dissolving the shield of general immunity retained by municipalities." <u>Steiner by Steiner</u>, 509 A.2d at 1370 (citation and internal quotation marks omitted). "[A]lthough the liability of a political subdivision is based primarily on personal liability of its officials through the operation of respondeat superior, the Code does not purport to impose governmental liability for the willful, tortious misconduct of its employees." <u>Id.</u> (citation omitted).

53

"Willful misconduct has been defined by the Pennsylvania Supreme Court as 'conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied.' " Sanford, 456 F.3d at 315 (quoting Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994)); See also W. on behalf of S.W. v. Pittsburgh Pub. Sch., 327 A.3d 340, 343 (Pa. Commw. Ct. 2024). Explained differently, "willful misconduct" is synonymous with an intentional tort. Sanford, 456 F.3d at 315.

The cornerstone of plaintiffs' allegations here is that Parciasepe deliberately failed to inform J.M.'s father of the April incident and intentionally failed to intervene to protect J.M. (Doc. 10, Am. Compl. ¶¶ 133, 134, 138). Plaintiffs predicate their IIED claim against ESASD on Parciasepe's alleged intentional tort. Under Pennsylvania law, an ESASD employee's intentional tort cannot subject ESASD to liability.

Turning to Robins's alleged misconduct, plaintiffs assert that ESASD, by and through the acts and failures to act of its transportation director, willfully disregarded S.M.'s concerns. (Id. ¶ 144). The same analysis applies here. ESASD cannot be held liable for Robins's alleged intentional tort. Accordingly, plaintiffs' claim for IIED against ESASD will be dismissed with prejudice.

### ii.    Defendants Robins and Parciasepe

As for the Defendants Robins and Parciasepe, because IIED is an intentional tort, they cannot assert immunity in this context. See 42 PA. CONS. STAT. § 8550.  Nonetheless, plaintiffs' claims against the transportation director and bus driver fall short of stating valid IIED claims.

Starting with Defendant Robins, plaintiffs do not allege that she was on the bus during either incident.  Moreover, based on plaintiffs' allegations, Robins's only connection to the April incident is her prior alleged failure to change J.M.'s assigned seat after the March incident.  As for the element of extreme or outrageous conduct, plaintiffs allege that Robins failed to prevent something outrageous from happening, not that she was the person directly involved in that conduct.  Thus, even if the court takes all the allegations against Robins as true and construes all inferences from those allegations in favor of the plaintiffs, the plaintiffs have not alleged a plausible IIED claim against her.  Consequently, the defendants' motion to dismiss the IIED claim against Defendant Robins will be granted and this claim will be dismissed with prejudice.

Turning to Parciasepe, the bus driver for the April incident, plaintiffs contend that Parciasepe's conduct was outrageous and extreme as he allegedly witnessed J.M being violently beaten on the bus and failed to intervene. (See Doc. 10, Am. Compl. ¶¶ 74-85).

Parciasepe's failure to stop the attack cannot, as a matter of law, subject him to liability for IIED. See Jackson v. Sun Oil Co. of Pa., 521 A.2d 469, 471 (Pa. Super. Ct. 1987). "[T]here is no cognizable claim under Section 46 where the failure to act, i.e., negligence of a party, forms the basis of the claim." Id. (citing Restatement (Second) of Torts § 46)). Plaintiffs do not allege that an affirmative or intentional act on the part of Parciasepe caused J.M. severe emotional distress. Rather, it was the attack by Student A. that Parciasepe failed to prevent or cease which allegedly caused J.M. severe emotional distress. Thus, defendants' motion to dismiss J.M.'s claim for IIED against Parciasepe will be granted. This claim will also be dismissed with prejudice.

In addition to J.M.'s IIED claims against the defendants, T.M. and S.M. also assert their own claims for IIED. When plaintiffs like T.M. and S.M. bring an IIED claim based on conduct that is directed at a third party such as their son, there are additional requirements that the plaintiff must establish. One requirement includes that the plaintiff was " 'present at the time' when the extreme and outrageous conduct occurred." See Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652-53 (Pa. 2000) (quoting Restatement (Second) of Torts § 46(2)) (holding that a mother could not state a claim for intentional infliction of emotional distress arising from medical malpractice that caused her daughter's death because the mother did not contemporaneously observe the malpractice); Johnson v.

<u>Caparelli</u>, 625 A.2d 668, 673 (Pa. Super. Ct. 1993) (holding that parents could not maintain a claim for intentional infliction of emotional distress based on a priest's sexual abuse of their child as they were not present when the abuse occurred).  Here, neither T.M. nor S.M. allege that they were present when J.M. was attacked on the bus during either incident.  Although T.M. observed J.M. bleeding from his face when he picked him up at the bus stop, the amended complaint does not allege that T.M. witnessed Student A. attacking J.M on the bus.[20]  Therefore, T.M.'s and S.M.'s claims for IIED will be dismissed with prejudice.

### b. Negligence

Count IV asserts negligence claims against Defendants ESASD, CIU20, Robins, and Parciasepe.[21]  Defendants also move to dismiss these claims by relying solely on ESASD's municipal immunity.  Defendants did not otherwise

---

[20] T.M. watched a selected portion of the bus's surveillance footage from April 25, 2022 which depicted Student A.'s attack on J.M. (Doc. 10, Am. Compl. ¶ 100).  J.M.'s mother, S.M., allegedly refused to watch the video. (<u>Id.</u> ¶ 101).  The fact that T.M. watched the surveillance footage has no bearing here. "Presence is a crucial element of the tort because an individual who witnesses outrageous or shocking conduct directed at a third-party has no time in which to prepare himself / herself for the immediate emotional impact of such conduct." <u>Taylor</u>, 754 A.2d at 653 (quoting <u>Johnson v. Caparelli</u>, 625 A.2d 668, 673 (Pa. Super. Ct. 1993)).  Thus, "the emotional effects are generally lessened where the individual learns of the outrageous conduct long after its occurrence and by means other than through his or her own personal observations." <u>Id.</u>

[21] Given that CIU20 will be dismissed from this action, plaintiffs' negligence claims will proceed only against ESASD, Robins, and Parciasepe absent plausible claims asserted against CIU20 in a second amended complaint as will be permitted in this case.

challenge the sufficiency of plaintiffs' negligence allegations.  Because the vehicle liability exception applies here, and defendants have offered no alternative basis for dismissal, the motion to dismiss Count IV of the amended complaint will be denied.

On a side note, defendants argue that some of plaintiffs' alleged damages are not sufficient enough for recovery under the PSTCA. (Doc. 16, Br. in Supp. at 30). Specifically, defendants assert that pain and suffering are only available in situations of death or in cases of permanent loss of a bodily function, permanent disfigurement, or permanent dismemberment pursuant to 42 PA. CONS. STAT. § 8553. (Id.)  Per defendants, the complaint does not identify these types of injuries. (Id.)  The court disagrees with defendants.

Plaintiffs specifically allege that J.M. sustained numerous traumatic injuries as a result of the attacks including but not limited to, facial contusions, dental injury, lacerations, traumatic brain injury, post-traumatic stress disorder, and other alleged permanent disabling injuries. (Doc. 10, Am. Compl. ¶¶ 92, 102, 107, 109, 110).  At this juncture, plaintiffs have sufficiently pleaded facts supporting their request for pain and suffering damages.  Thus, to the extent defendants seek to dismiss plaintiffs' request for pain and suffering damages, such request will be denied.

## IV.    Leave to Amend

In civil rights cases, the court must offer amendment unless an amendment would be inequitable or futile. <u>Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.</u>, 482 F.3d 247, 251 (3d Cir. 2007).  On one hand, allowing the filing of a second amended complaint would provide the counseled plaintiffs with a third attempt to state plausible equal protection and due process claims against all defendants as named in this action.  With additional facts and with a clearer style of pleading, plaintiffs may be able to advance plausible claims for the violation of J.M.'s constitutional rights under the Equal Protection Clause.  They may also be able to plausibly state claims for violation of the Due Process Clause against defendants other than Robins and Parciasepe.  It is equitable to provide the plaintiffs with one final attempt to allege viable Fourteenth Amendment claims against all defendants.

Additionally, with respect to Defendants CIU20, William Riker, and Jennifer Moriarty, the dismissed defendants, plaintiffs will be provided with leave to allege more facts against them if they so choose in a second amended complaint to support their Section 1983, Section 504, and state law negligence claims. Plaintiffs will also be provided with leave to allege more facts against Robins and Parciasepe in a second amended complaint to support their Section 504 claims.

Plaintiffs' claims for IIED against Defendants ESASD, Robins, and Parciasepe will be dismissed with prejudice. Amendment would clearly be futile at this point on any IIED claim.

**Conclusion**

For the reasons set forth above, the defendants' motion to dismiss plaintiffs' amended complaint will be granted in part and denied in part. As to Count I, the motion to dismiss will be granted in part. Specifically, plaintiffs' equal protection claims against all defendants will be dismissed without prejudice, subject to the permitted amendment. The motion will be denied as to plaintiffs' due process claims against Robins and Parciasepe, but granted as to Riker, Moriarty, CIU20, and ESASD. Dismissal of Count I as to Riker, Moriarty, CIU20, and ESASD will be without prejudice.

With respect to Count II, the motion will be granted as to Defendants Riker, Moriarty, Robins, Parciasepe and CIU20. Dismissal of Count II as to Riker, Moriarty, Robins, Parciasepe, and CIU20 will be without prejudice, subject to the permitted amendment. However, the motion will be denied as to ESASD.

Regarding Count III, the motion to dismiss will be granted as to Defendants ESASD, Robins, and Parciasepe, the only defendants named in that count, which will result in the dismissal of plaintiffs' IIED claims with prejudice.

With regards to Count IV, dismissal will be granted without prejudice as to CIU20, but the motion will be denied as to ESASD, Robins, and Parciasepe, the other defendants named in that count.

Lastly, defendants' motion to dismiss plaintiffs' request for damages for J.M.'s pain and suffering will also be denied.  An appropriate order follows.

Date: 12/11/25

JUDGE JULIA K. MUNLEY
United States District Court